UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

THOMAS E. FISTER,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant.

_______________________________________/

No. C 11-01461 LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR PAYMENT OF BENEFITS**

[Re: ECF Nos. 19, 20]

## I. INTRODUCTION

Plaintiff Thomas Fister moves for summary judgment, seeking judicial review of a final decision by defendant Michael Astrue, the Commissioner of Social Security Administration (the "Commissioner"), denying him Social Security Income ("SSI") disability benefits for his claimed disability of affective disorder. Plaintiff's Motion, ECF No. 19. The Administrative Law Judge ("ALJ") found that Mr. Fister could perform his past relevant work as a "grocery clerk" and that he was capable of performing another job, that of a "housekeeper" (DOT # 381.687-014), that existed in significant numbers in the national economy. Administrative Record ("AR") at 12-23.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to the court's jurisdiction. ECF Nos. 7, 8. For the reasons stated below, the court **GRANTS** Mr. Fister's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgement, and **REMANDS** this case to the Social

Security Administration for the payment of benefits.

## II. PROCEDURAL HISTORY

Mr. Fister, now 51 years old, applied for disability benefits on January 13, 2006. AR 71, 107-12. The Commissioner denied his application both initially and upon reconsideration. AR 70-71. Mr. Fister timely requested a hearing before an ALJ on July 19, 2007. AR 83-85.

An ALJ conducted a hearing on July 29, 2008 in San Rafael, California. AR 24-69. Mr. Fister appeared with his attorney, David Linden, and testified at the hearing along with vocational expert Jeff Malmouth (the "VE"). AR 24. The ALJ issued a decision on February 9, 2009 that found Mr. Fister not to be disabled because he could perform his past relevant work as a "grocery clerk" and because he was capable of performing another job, that of a "housekeeper" (DOT # 381.687-014), that existed in significant numbers in the national economy. AR 12-23.

On or about February 11, 2009, Mr. Fister timely requested that the Appeals Counsel review the ALJ's decision. AR 10. On January 12, 2011, the Appeals Counsel sent Mr. Fister a Notice of Appeals Council Action informing him that it declined to grant the request for review. AR 5-9. The Appeals Council's action resulted in the ALJ's February 9, 2009 decision becoming the Commissioner's final decision. *See id*. Because the Appeals Counsel did not send its Notice for nearly two years, Mr. Fister requested an extension of time to file his civil action. AR 2. This request was granted by the Appeals Council on April 21, 2011. AR 1.

Mr. Fister commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). Complaint, ECF No. 1. Mr. Fister and the Commissioner both now move for summary judgment. Plaintiff's Motion, ECF No. 19; Commissioner's Opposition and Cross-Motion, ECF No. 20.

## III. LEGAL STANDARD

### A. Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more

than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

**B. <u>Applicable Law: Five Steps to Determine Disability</u>**

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the

national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *See Tackett*, 180 F.3d at 1098.

**IV. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

This section summarizes (A) the medical evidence in the administrative record, (B) Mr. Fister's testimony, (C) the vocational expert's testimony, and (D) the ALJ's findings.

**A. Medical Evidence**

**1. Background**

Mr. Fister alleges disability beginning May 28, 2004, based upon a combination of mental and physical impairments. AR 38-39, 107. In a report dated February 28, 2005, Mr. Fister's treating psychologist, Dr. John Brandes, described the events leading up to Mr. Fister's period of claimed disability as follows:

> Thomas Fister was most recently until 05/28/04 working as a Grocery Manager at Albertson's Food Store in Suisun, California. He had begun with Lucky Food Stores in Napa many years again high school in 1977. He quit when he went to the junior college and then began again on 09/13/83 in Pinole, California, as a part time clerk on the graveyard shift. He then moved to Hercules, California, working for Lucky Food Store on the swing-shift as a Department Head, and was promoted to the third person in authority in the store until 1995/96 when he came back to Napa. He had then gone to the Vallejo store and moved to Suisun in 2002 as the Grocery Manager. In Napa he was an Assistant Manager. Sometime during the course of his career Lucky Food Stores was bought by Albertson's and his employer became Albertson's Food Store.
>
> Mr. Fister's problems in Suisun had to do with his work schedule and hours worked and involved loss of sleep and overall physical instability due to these conditions. His salaried position required five 9-hour days, but in fact he was asked to work 10 to 12 hours a day, 60 hours a week. A female manager in his store in Suisun put in long hours and she expected her managers to also put in long hours. Mr. Fister felt that be was doing most of the work in the small Albertson's store. [Mr.] Fister had problems because the graveyard management could not attend and he was shifted to the graveyard shift and ended up working 10 to 12 hours a day and had problems sleeping which resulted in unstable emotional status. He was even nauseated. Eventually he was taken off work by his physician, Dr. Gouff, in Fairfield, California.
>
> Thomas Fister worked [for] over 20 years for his employer earning five years of vacation. The new store manager in Suisun, by the name of Jackie, began at a lower pay scale. The new manager wanted week-ends off and assigned other people to cover her responsibilities. The night crew manager was a good worker who did not

UNITED STATES DISTRICT COURT
For the Northern District of California

> get along with Jackie, the new manager, and hurt his knee and was off for five weeks. It was then that Thomas Fister was put on graveyard because of his hard work ethic and ability to help the store. Sales were slipping in the store. Things, according to him, were not being run right, but the tension of working those hours in addition to overtime the following morning found him unable to sleep during the day, and he was running himself down physically. He had no rest. Often, he was forced to work a double shift. He experienced headaches and experienced nausea. There were also chest pains and his disability continued. [Mr.] Fister told his boss that he felt physically sick, and even told her about his chest pain. She privately told him, according to Mr. Fister, that she knew it must be the stressful work conditions, the double shifts, and the added hours that were making him sick, but she still wanted to know that he would continue. He stated he would go seek medical advice. Thomas Fister did not have a regular physician, but previously he had had a cyst that was found on his testicle and he had it removed five years ago by Dr. Gouff, in Fairfield, California. He was ultimately seen by Dr. Gouff on the 29th, but went to Work Health and saw a physician and ultimately was taken off work by Dr. Gouff and then was referred to the undersigned who saw the stress disability Mr. Fister was experiencing and took him off work since then. Thomas Fister's last day of work was 05/27/04.

AR 194-95.

**2. <u>Dr. Athanassious (May - July 2004)</u>**

Mr. Fister saw Dr. Athanassious during from May through July 2004. AR 256-66. Dr. Athanassious diagnosed Mr. Fister with job stress, insomnia, headaches, and chest pains, and prescribed him medication. AR 256-66. On June 9, 2004, Dr. Athanassious referred Mr. Fister for psychiatric treatment, AR 264, and placed him on medical leave of absence, *see* AR 284-85.

**3. <u>Dr. Perliss (August 2004)</u>**

On August 16, 2004, Dr. Herbert Perliss, then an Assistant Clinical Professor of Psychiatry at University of California - San Francisco Medical Center, conducted a "psychiatric disability evaluation" of Mr. Fister "in regard to a recent stress claim in which he alleges psychic injury among other body parts, including cardiovascular and gastrointestinal." AR 278. Dr. Perliss prefaced his report, also dated August 16, 2004, by noting that "Mr. Fister understands that this is a psychiatric examination to assess his current emotional/psychological state; [and] that I have reviewed brief medical records from North Bay Occupational Health, and from his treating psychologist, John Brandes, Ph.D." AR 279. Following his interview and review of records, Dr. Perliss diagnosed him as having an "Adjustment disorder with features of anxiety and depression - in substantial remission." AR 285. He also noted that Mr. Fister presented with "passive-dependent and obsessive personality features." AR 285. Dr. Perliss then stated his clinical considerations, in

relevant part, as follows:

> In the CLINICAL CONSIDERATION of this matter, Mr. Fister is found to have developed an acute stress syndrome – somatic symptomatology, tension/anxiety, and depressive symptoms over a period of several weeks – ADJUSTMENT DISORDER under the Guidelines of DSM-IV-R.
>
> His symptoms – headaches, chest pain, and gastrointestinal distress along with symptoms of tension/anxiety and depression – have been responsive to the use of a minor tranquillizer and the soporific, used for a brief period of time, that reestablished his usual sleep pattern. He has also benefitted from a psychotherapy intervention and from his absence from work.
>
> His MENTAL STATUS finds that his symptoms are in substantial remission, though he has mild residual depressive symptoms of his acute stress disorder.
>
> The psychological test data reveal a high level of somatic reactivity consistent with what he reported in filing this "stress" claim. On the test data, he also presents his primary problems as being somatic in nature, representing himself as psychologically normal, responsible, logical and reasonable, self-confident, relaxed, content, and without fault. There are inconsistencies on other tests. For example, he does not report any particular dysphoria except for anger at others, especially his employer – but also reports feeling "constantly and moderately" depressed on the Hamilton Depression Inventory. Essentially, his emotional/psychological distress is reflected ina plethora of physical complaints.
>
> Given the obsessive and ruminative features of his temperment/personality, he is uneasy about resuming his usual work effort until he feels more fit and/or can arrange with the Store Director to establish some limits on his work demands.
>
> He would seem to have a COMPENSABLE APPLICATION given the increased demands of his work, especially after he was assigned to the graveyard shirt. This would seem to be the ***predominant factor***[], as to all others combined, in the evolution of his acute stress syndrome. I find no significant non-industrial stressors.

AR 285-86 (emphasis in original). Dr. Perliss then concluded:

> For all intents and purposes, the applicant is PERMANENT, STATIONARY, AND RATABLE on a psychiatric basis <u>at the time of this examination</u>, though I would use September 1, 2004, as an anticipated date for him to resume his usual work effort as a grocery manager. He needs time to establish his reentry to the store in talks with the Store Director, and to further reconcile this matter in his psychotherapy.
>
> There is a period of *temporary total disability* from 05/27/04 to 09/01/04.
>
> He is not expected to have any disability residuals with more complete resolution of his adjustment disorder; however, there are current symptomatic residuals – specifically, mild vegatative signs of depression along with irritability – that produce PSYCHIATRIC IMPAIRMENT under the "Work Function Guidelines" describes as follows:
>
> – ***very slight impairment*** in his ability to relate effectively and appropriately with others – WF-5 and 6 – a reflection of his mild mood disphoria and irritability;

> – ***no impairment*** in the other Group II Work Functions – WF-4, 7, and 8 – no impairment in his cognition, his judgement, or his capacity for responsible and appropriate behavior;
> – ***no impairment*** in any Group I Work Functions – WF-1, 2, and 3 – his mild vegetative signs would not appreciably limit his ability to maintain an appropriate work pace; he sleeps well and has energy; rather, these symptoms – which inhibit is more immediate return to work – reflect an element of overprotection, which is not warranted given his *actual* physical well-being.
>
> His TREATMENT should continue as an industrial benefit until sometime after he returns to work – CPT-90807 psychotherapy sessions biweekly up to eight sessions. No psychotropic medication is indicated at this time. He has not used a minor tranquilizer for several weeks and uses Ambien on a p.r.n. basis. He is not expected to require future psychiatric care as an industrial benefit.

AR 286-87 (emphasis in original).

**4. <u>Dr. Brandes (June 2004 - September 2006)</u>**

On June 17, 2004, Mr. Fister was examined by clinical psychologist Dr. Brandes. AR 196. Dr. Brandes became Mr. Fister's treating psychologist as of that date. AR 193, 196, 249, 279. Dr. Brandes diagnosed Mr. Fister with "an Adjustment Disorder with Depression and Anxiety, DSM IV, 309.28," and recommended that Mr. Fister undergo "individual psychotherapy." AR 196. Dr. Brandes also "took [Mr. Fister] off work for two months," starting then. AR 196.

On January 28, 2005, Dr. Brandes performed a review of records and a comprehensive psychological evaluation of Mr. Fister. AR 193-206. In his subsequent report, dated February 28, 2005, Dr. Brandes concluded, in relevant part, as follows:

> Thomas Fister is a 43-year-old Grocery Manager for Albertson's Food Store who was taken off work on 05/28/04 and came to treatment with the undersigned on 06/17/04 and he has not been back to work since. Thomas Fister was originally off work because of chest pains, headache, nausea, and psychosomatic reactions to the stress of his job. His work seemed to be unreasonable in terms of the numbers of hours and the schedule he was required to keep. He was exhausted physically because he could not sleep during the day as he was working graveyard shifts; he was working in an environment that was highly chaotic and poorly managed as far as his own self description and that of others is concerned according to him. [Mr.] Fister broke down physically and psychologically and has been in treatment ever since. The undersigned finds [Mr.] Fister to come from an adequate family background. He has limited education, primarily high school and some courses at the junior college. For most of his adult life he has worked for Lucky Food Stores. [Mr.] Fister intended to complete his working career in the grocery business and wonders what the future has in store for him. [Mr.] Fister has not had problems with drugs or alcohol. He has been busy and responsible. He owns two homes and tries to provide upkeep for them. However, his finances are stretched as he is on temporary disability at the present time through EDD. The undersigned also notes that he saw a defense QME psychiatrist whose report has not been made available to the undersigned. It would

> be interesting to see what interpretation by another health professional is regarding Thomas Fister. The undersigned finds [Mr.] Fister's psychological testing to highlight his disability as far as personality is concerned. He shows himself to not manifest evidence of major mental illness, schizophrenia or psychosis. He was cooperative, communicative, and responsible throughout his course of treatment with the undersigned. The undersigned notes he is of above-average intelligence, very interested in his career in the grocery business, and is trying to make plans for the future. He does not know when he will be able to go back to work. The undersigned will make recommendations later in this report.
>
> My diagnostic impression is DSM IV, AXIS I, 309.28, ADJUSTMENT DISORDER WITH MIXED FEATURES, DEPRESSION AND ANXIETY, IMPROVED. AXIS II NO DISORDER. AXIS III, PSYCHOPHYSIOLOGICAL PROBLEMS NOTING HEADACHE, CHEST PAIN, AND NAUSEA. AXIS IV, PSYCHOSOCIAL STRESSORS ARE MODERATE TO SEVERE, CODE 4, PRIMARILY OCCUPATIONAL, FINANCIAL, AND UNCERTAINTY ABOUT THE FUTURE. AXIS V, A GAF RATING OF 52, WITH THE HIGHEST ACHIEVED DURING THE PAST YEAR OF 54.
>
> Thomas Fister has experienced a complex reaction to unreasonable working conditions at Albertson's Food Store; long hours, lack of sleep, and psychophysiological breakdown. The undersigned believes that causation for his problems are industrial at the 51% level from a psychological perspective. That estimate has also been voiced by other doctors who evaluated this case. The undersigned finds that he has needed treatment from the date he began psychotherapy with me on 06/15/04 and will continue to need treatment for the next three to six months as far as his going back to work in his chosen profession or finding some other area of employment. [Mr.] Fister would have to be seen as a qualified injured worker if he were required to go back to work in the Suisun store under its current manager. However, under different circumstances he could continue being a produce manager in a supermarket and would not be considered a qualified injured worker. [Mr.] Fister is somewhat fragile from a psychological perspective. The undersigned, however, finds that he is permanent and stationary as of the date of this writing. My estimates of permanent disability will be found in Appendix A of this report. Please note that I will use both the former and the current system of rating permanent disability for comparison purposes only, and, hopefully, this will be useful to the reader of this report. The undersigned finds regarding Revised Labor Code Section 4663 that there is no basis to apportion causality of permanent disability. His residual permanent disability is 100% due to his recent employment with Albertson's Food Stores. The undersigned does not believe that Mr. Fister will be amenable to taking antidepressant medication as he continues to work-out, be physical, and takes pride in overcoming his problems without the assistance of psychopharmacology.

AR 202-04.

In the accompanying"Work Function Impairment Form," Dr. Brandes opined that Mr. Fister featured a "Slight-Moderate" level of impairment in his "ability to perform complex or varied tasks"; a "slight" level of impairment in his abilities "to maintain a work pace appropriate to a given workload," "to relate to other people beyond giving and receiving instructions," "to influence other people," "to make generalizations, evaluations, or decisions without immediate supervision," and "to

UNITED STATES DISTRICT COURT
For the Northern District of California

accept and carry out responsibility for direction, control, and planning"; and a "very slight" level of impairment in his abilities "to comprehend and follow instructions" and "to perform simple and repetitive tasks." AR 205.[1] In addition, on the Qualified or Agreed Medical Evaluator's Findings Summary Form, Dr. Brandes noted that Mr. Fister's disability was "permanent" but that Mr. Fister could return to work "immediately," but only "with restrictions." AR 206.

Dr. Brandes also authored a supplemental psychological report dated July 13, 2005, in which he addressed Dr. Perliss's August 16, 2004 report. AR 190-92. In relevant part, Dr. Brandes explained:

> Dr. Perliss felt as I did later that [Mr.] Fister's psychological problems were a predominant factor, and, therefore, his condition was a compensable application. He diagnosed as well on Axis I, Adjustment Disorder With Features of Anxiety and Depression. <u>However, Dr. Perliss and I disagree on the extent of the problem</u>. The undersigned has been treating Mr. Fister since 05/17/04, and by the time he saw Dr. Perliss he was still substantially impaired from my point of view. . . . Dr. Perliss . . . states that [Mr. Fister's] condition on 08/16/04 was in substantial remission and that his period of temporary total disability only went from 05/27/04 to 09/01/04. [Dr. Perliss] found very slight impairment on work functions five and six, and no impairment on the other work functions. <u>The undersigned disagrees substantially with Dr. Perliss in regard to that</u>. . . .
>
> . . .
>
> In regard to a review of the medical record, my convictions stated in my report of 02/28/05 and this report are firm. I believe Dr. Perliss minimalized [*sic*] the impact of Mr. Fister's work experience at Albertson's, although he does agree that there is industrial causation of his mental and emotional and psychophysiological reactions at the time he did the evaluation. [Dr.] Perliss'[s] estimates of residual permanent disability are minimalized [*sic*], and I believe the GAF rating of 52, or moderate impairment relative to symptomatology, more fully represents this man.

AR 191-92 (emphasis added).

Mr. Fister continued to see Dr. Brandes until September 28, 2006. AR 249. He did not see Dr. Brandes again until February 28, 2008. AR 249.

**5. <u>Dr. Young (October 2006)</u>**

During the hiatus in Mr. Fister's treatment with Dr. Brandes, at the request of the Commissioner, Mr. Fister underwent a psychological evaluation that was conducted by Dr. April Young on October

---

[1] "Moderate Impairment" was defined as "Markedly Limits the function," "Slight Impairment" was defined as "Limited but does not preclude function," and "Very Slight Impairment" was defined as "Not obvious but detectable with diagnostic measures." AR 205.

10, 2006. AR 209-211. Regarding his "affective status," Dr. Young reported that

> Mr. Fister continues to have difficulty sleeping. His sleep is variable. He has gained approximately 18 lb. He reported apathy. He is not interested in going to the gym. He feels frustrated with his forgetfulness (e.g. locking himself out of his car.) He has difficulty focusing. He reported difficulty with his concentration and short term memory. He no longer socializes. He denied a history of violence. His MMPI-2 profile was consistent with his reported symptoms of fatigue, headaches and sleep disturbance.

AR 210. Following her evaluation, Dr. Young reported the following Axis I "diagnostic impressions": "Primary Insomnia; Depressive Disorder NOS with anxious features; R/O Somatoform Disorder NOS; and R/O Dysthymic Disorder." AR 211. She then offered the following "medical source statement":

> Based on today's evaluation, including clinical interview, mental status examination, and review of available documentation, the above diagnoses and following medical source [statement] are offered. The examination should be considered in conjunction with any other documentation which may become available, particularly as this report represents a one time evaluation. With these limitations having been noted, it is my opinion that from a psychological standpoint alone, the following statements reasonably reflect Mr. Fister's abilities.
>
> Based upon observations of current behavior and reported history, the claimant's ability to deal with the public, supervisors and co-workers would be mildly impaired.
>
> <u>When confronted with straight forward one and two step tasks, the results of the current examination indicate that the claimant's abilities would be moderately impaired</u>. His ability to perform increasingly complex multi-step and higher tasks was not evaluated, although brief mental status testing suggested that the claimant would have difficulties.
>
> Based on the current examination, the claimant is able to manage his funds in his best interest at the present time.

AR 211 (emphasis added).

**6. <u>Dr. Robinson (October 2006)</u>**

On October 12, 2006, Mr. Fister underwent a "comprehensive internal medicine evaluation" that was conducted by Dr. Mark Robinson. AR 212-15. In his report, Dr. Robinson noted that Mr. Fister's chief complaints were severe depression and back pain. AR 212. Based on the evaluation, Dr. Robinson diagnosed Mr. Fister with an unspecified psychiatric disorder and with "minor mechanical low back pain." AR 214. In his "functional assessment," Dr. Robinson stated:

> The number of hours [Mr. Fister] could be expected to stand or walk in an eight-hour day [is] without restrictions.

> The number of hours [Mr. Fister] could be expected to sit in an eight-hour workday is without restrictions.
>
> Assistive device, none at present.
>
> The amount of weight [Mr. Fister] could lift and carry is without restrictions.
>
> Postural limitations, none.
>
> Manipulative limitations, there are no limitations.
>
> Relevant visual, communicative, or workplace environmental limitations, none except those that might be points out by a mental health assessment. (Though [Mr. Fister] raised more than one complaint, it is clear that his primary problem is his psychiatric condition.)

AR 214-15.

**7. <u>Dr. Gross (November 2006)</u>**

Mr. Fister underwent an examination by Dr. D.E. Gross on November 4, 2006. AR 216-229. Dr. Gross's "functional capacity assessment" was that Mr. Fister is limited to "simple to complex tasks with limited public contact." AR 229. He found Mr. Fister to have a mild limitation with respect to daily living activities and maintaining social functioning, but not to have limitation with respect to maintaining concentration, persistence, or pace. AR 224. He also found that Mr. Fister was moderately limited in his ability to "work in coordination with or proximity to others without being distracted by them," "to interact appropriately with the general public," and "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." AR 227-28. He did not find Mr. Fister to be significantly limited in any other way. AR 227-28.

**8. <u>Dr. Brandes (February 2008 - July 2008)</u>**

After the above-mentioned hiatus, Mr. Fister saw Dr. Brandes again from February 28, 2008 to July 24, 2008. AR 182, 249. In a report dated April 8, 2008, Dr. Brandes described Mr. Fister's then-current status and provided his current diagnosis as follows:

> Thomas Fister currently presents as a 6 foot, 220 pound, male Caucasian looking his stated age who is oriented as to person, place, and time. His overall sensorium is clear. He is verbal and is of at least average intelligence. He has consistent stream of consciousness. There is no evidence of major mental illness. Remarkable, however, is his mood which is highlighted by depression and anxiety. He has difficulty with sleep, loss of energy, trouble concentrating, feeling restless and agitated at times, and feeling somewhat hopeless about the future. [Mr.] Fister does not exhibit suicidal or homicidal thoughts. He is socially isolated for the most part. He is guarded in regard to his trust of other people. He has difficulty motivating in terms of his own self care.

> [Mr.] Fister attempts to present with a positive image but his emotional instability and lack of confidence to deal with conflicts in work settings cause him to not be able to perform.
>
> The undersigned finds Thomas Fister to have a substantial loss of capacity to not be able to work 8 hours a day, 40 hours a week in a familiar setting. Even unskilled labor positions would be difficult for him. He could perform some work but certainly not on a full time basis. He should have access for psychotherapy to help him understand his problems and work with him in a productive way. He tends to be somewhat guarded and defensive but willing to work on himself and, certainly, cannot imagine working in the stressful environment of retail groceries.
>
> My diagnostic impression is DSM IV, AXIS I, 311.0, DEPRESSION NOT OTHERWISE SPECIFIED. AXIS II, NO DISORDER. AXIS III, PSYCHOPHYSIOLOGICAL REACTIONS, PRIMARILY RELATED TO STRESS. AXIS IV, PSYCHOSOCIAL STRESSORS ARE CONSIDERED MODERATE TO SEVERE, CODE 4, PRIMARILY FINANCIAL, UNCERTAINTY ABOUT THE FUTURE, AND SELF-CARE. AXIS V, A GAF RATING OF 54, OR MODERATE SYMPTOMATOLOGY.
>
> Thomas Fister is an interesting individual who presents himself as being very intact but when one looks at his behavior and his overall sense of futility one realizes that he is masking his depression which would make it difficult for him to participate in a work-like setting. The undersigned recommends that he is disabled from full time employment. He is responsible and capacity to manage his own money. Mr. Fister must function in the future with expectations for his performance that are less than what he attempted to do during his career of working for 20-22 years with retail food working for a grocery chain.

AR 250-51 (emphasis added).

Around the same time (April 3, 2008), Dr. Brandes completed, with respect to Mr. Fister, a "Medical Source Statement Concerning The Nature and Severity of an Individual's Mental Impairment." AR 244-48. In relevant part, addressing the disability criteria set out in Social Security Ruling 85-15, Dr. Brandes concluded that Mr. Fister has a "substantial loss" of his "ability to respond appropriately to supervision, co-workers and usual work situations" and his "ability to deal with changes in a routine work setting." AR 247.

In the same document, Dr. Brandes addressed Mr. Fister's functioning in 20 categories of mental work-related areas and concluded that Mr. Fister had "moderately severe" limitations with respect to his "ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances," and his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." AR 245. Dr. Brandes further concluded that Mr.

Fister had "moderate" limitations with respect to his abilities "to understand and remember detailed instructions," "to carry out detailed instructions," "to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure),"to work in coordination with or proximity to others without being unduly distracted by them," "to accept instructions and to respond appropriately to criticism from supervisors," and "to respond appropriately to changes in the work setting." AR 245-46. Dr. Brandes also concluded that Mr. Fister had "mild" limitations with respect to his abilities "to remember locations and work-like procedures," "to understand and remember very short and simple instructions," "to carry out short and simple instructions," "to sustain an ordinary routine without special supervision," "to make simple work-related decisions," "to interact appropriately with the general public," "to ask simple questions or request assistance," "to get along with co-workers or peers without unduly distracting them or exhibiting extreme behavioral extremes," "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," "to be aware of normal hazards and take appropriate precautions," "to travel in unfamiliar places or to use public transportation," and "to set realistic goals or to make plans independently of others." AR 245-46.

On April 23, 2009, Dr. Brandes provided a clinical update about his treatment of Mr. Fister. AR 182-83. Dr. Brandes reported that he recently had seen Mr. Fister on February 26, 2009, March 20, 2009, and April 3, 2009. AR 182. Dr. Brandes stated:

> In my most recent evaluation of 04/08/08, I noted that [Mr.] Fister was depressed, that there were psychophysiological reactions related to stress, and that for the most part he was not productive although he could perform some activities of daily living such as taking care of himself, [and] shopping[,] but for the most part I did not see him employable on a full-time bas[i]s. Mr.Fister's condition of depression is reflected in part by his low psychological tolerance. His life for the most part is not stressful because he is not working. Most occupations, even those with medium to light physical work, require attention to detail, collaboration, cooperation, a changing schedule, and my opinion clinically reaffirmed by my recent evaluation of Mr. Fister is that he is unable to perform in a reliable manner in a capacity required by any type of full-time employment. <u>Dr. Perliss and I initially saw Thomas Fister being able to perform with some accommodation in the workplace and his mental and emotional problems would not[,] we thought[,] seriously interfere with his ability to function. However, over the years [Mr.] Fister has proved that his condition must be considered more chronic. In my opinion he would deteriorate dramatically if placed in a work related circumstance, working under supervision within the context of organized commercial activity</u>. For the most part Thomas Fister watches TV, uses

UNITED STATES DISTRICT COURT
For the Northern District of California

> his computer, and takes care of his basic needs in the best manner that he can. He does have concentration and attention to detail impairment, and low psychological tolerance, which would suggest that he over-reacts to many stimuli in his life and in attempting to meet the requirements of any job they likely to develop or be clear evidence of his depression which would cause further impairment.
>
> As further stated in my last report, [Mr.] Fister presents as being relatively intact psychologically but there is an overall sense of futility and dysphoric mood which suggests to me that he masks his depression which makes it more difficult for him to participate in a work-like setting. <u>The undersigned finds even though he was not seen for a year or two between 2006 and 2008, he was attempting to survive on his own and for the most part he was not improving his situation because he was not in treatment and probably should have been. Since he has been seen from 2008 up to the present his condition has worsened. That criteria and evidence is based on clinical evaluations being made on a continuous basis since I began to see him again in 2008 up to the present time</u>. [Mr.] Fister, in my opinion, should be given a level of financial disability support because of his overall mental status and the unlikeliness that he will improve dramatically to be able to work in a work setting of even mile to medium physical requirements. . . .

AR 182-83 (emphasis added).

**C. <u>Ms. Fister's Testimony</u>**

At the request of the Commissioner, Mr. Fister's mother, Elizabeth Fister, completed a "Function Report – Adult – Third Party" on March 9, 2006. AR 142-49. When asked what Mr. Fister was able to do before his illness, injuries, or conditions that he cannot do now, Ms. Fister responded: "Work at a job. Complete tasks and socialize." AR 143. And when asked to describe any changes in social activities since the illnesses, injuries, or conditions began, Ms. Fister reported that Mr. Fister "[d]oes not socialize with friends and does not go out with friends"; rather, he "[s]tays home a lot and is depressed." AR 147. She also noted: "His memory is not as good and his concentration is less. He does not complete tasks. He does not get along with others as good as he gets angry easily and irritated." AR 147. Ms. Fister also reported that Mr. Fister does not handle stress well, and that "[h]e gets angry and very irritated and his face turns red and he blows up." AR 148.

**D. <u>Mr. Fister's Testimony</u>**

At his hearing, Mr. Fister testified about, among other things, the nature of his past work. AR 33-38. Referring to the work history report that Mr. Fister submitted for purposes of his request for SSI disability benefits, AR 134-141, the ALJ asked Mr. Fister to describe the responsibilities required for each of the positions he held since 1983. AR 33-38. The ALJ noted, and Mr. Fister confirmed, that Mr. Fister worked as a "journeyman" (1983 to 1986), then as a "department head"

(1986 to 1996), then as a "head clerk" (1996 to 1999), then as an "assistant store manager" (1999 to 2001), and finally as a "grocery manager" (2001 to 2004). AR 34, 134. Mr. Fister testified that "[when] you go from "journeyman" clerk to a "department head," you're more of a full-time employee," although it is "[b]asically the same type of work, stocking and overseeing the store for a shift." AR 35. He testified that a "head clerk" was a "similar position" to a "department head": "[T]he hours change a little bit, but [the jobs are] basically the same, almost the same position, different title." AR 35. He also testified that the "assistant store manager" overseas the entire store and the bookkeeper, "that type of thing." AR 35. Finally, he testified that as "manager," "you'd be the primary person on-site, in charge. If it was a chain, you had people looking over your shoulder, if it's one store, you're kind of the main person." AR 35-36.

**E. <u>The Vocational Expert's Testimony</u>**

At the hearing, the vocational expert identified Mr. Fister's past work since 1986 (thereby leaving out Mr. Fister's job as a "journeyman clerk" from 1983 to 1986, *see* AR 134) as follows:

- "Department Head": The DOT title for this position is "Department Manager" (#299.137-010), and it requires medium exertional strength (SVP 7);
- "Head clerk": The DOT title for this position is "Grocery Clerk" (#290.477-0184), and while it is classified by the DOT as requiring light exertional strength (SVP 3), it requires medium exertional strength as performed by Mr. Fister (SVP 7);
- "Assistant Store Manager": The DOT title for this position is "Management Trainee" (#189.167-018), and while it is classified by the DOT as requiring light exertional strength (SVP 6), it requires medium exertional strength as performed by Mr. Fister; and
- "Grocery Manager": The DOT title for this position is "Retail Store Manager" (#185.167-046), and while it is classified by the DOT as requiring light exertional strength (SVP 7), it requires medium exertional strength as performed by Mr. Fister.

AR 58-59. The VE made clear that "all of the jobs that [Mr. Fister] performed, as he performed them," required "medium exertional strength." AR 58.

The ALJ then presented the VE with several hypothetical situations involving an individual with the same age, education, background, and experience as Mr. Fister and who can perform work with a

UNITED STATES DISTRICT COURT
For the Northern District of California

medium exertional strength. *See* AR 59-63.

In the first situation, the ALJ asked, under these conditions, whether that individual would be able to perform the identified past relevant work. AR 60. The VE testified that the individual would be able to perform the past relevant work because it required medium exertional strength. AR 60.

In the second situation, the ALJ added mild non-exertional limitations in the areas of concentration, pace, and persistence (roughly a 10% reduction in ability) and asked whether the individual would be able to perform the identified past relevant work. AR 60. The VE testified that those mild limitations "would erode [the individual's] ability to perform the higher functional levels of manager, managerial jobs, department head, those types of things." AR 61. However, the VE testified that the individual "would still be able to perform the grocery clerk position." AR 61.

In the third situation, the ALJ added moderate, rather than mild, non-exertional limitations in the areas of concentration, pace, and persistence (roughly a 20% reduction in ability) and asked whether the individual would be able to perform the grocery clerk position. AR 61. The VE testified that the individual would no longer be able to perform the grocery clerk position. AR 61-62.

In the fourth situation, the ALJ asked, assuming the individual had the same age, education, background, and experience as Mr. Fister, who can perform work with a medium exertional strength, and who also had a moderate non-exertional limitation in the areas of concentration, pace, and persistence, whether there are other jobs in the economy that the individual could perform. AR 62. The VE testified that the individual would be able to perform the job of a "Housekeeper" as identified by the DOT (# 381.687-014). AR 62. The VE did not think that this position would be "affected by a 20% reduction" in ability (i.e., a moderate non-exertional limitation in the areas of concentration, pace, and persistence). AR 62. The VE stated that there are both medium exertional strength and light exertional strength housekeeping positions. AR 62. The VE only presented job numbers for housekeepers performing at the light exertional level, and he testified that there are roughly 2,800 light housekeeping positions in the local economy and roughly 200,000 light housekeeping positions in the national economy. AR 62. The VE also testified that there would be more housekeeping positions in the economy if medium housekeeping positions also are included, although the VE could not say how many more. AR 62.

Finally, in the fifth situation, the ALJ added to the fourth situation unscheduled absences up to twice per month and asked whether that would affect the availability of the housekeeping positions. AR 62-63. The VE testified that unscheduled absences would affect not only the housekeeping positions but any other unskilled job in the open labor market. AR 63. The VE did not believe that an individual who needed to take "unscheduled breaks with that frequency each month would be competitive . . . for any unskilled job." AR 63.

On cross-examination, Mr. Fister's counsel asked the VE how a moderate impairment in the ability to perform simple, repetitive, one-to-two-step tasks would affect an individual with the same age, education, background, and experience as Mr. Fister, who can perform work with a medium exertional strength, and who also has a mild non-exertional limitation in the areas of concentration, pace, and persistence (roughly a 10% reduction in ability). AR 63-64. The VE testified that, in that situation, the individual would not be able to perform the identified past relevant work. AR 64-65.

Mr. Fister's counsel then asked whether, given the moderate impairment in the ability to perform simple, repetitive, one-to-two-step tasks, whether there is any other work in the open economy that the individual could do. AR 65-66. The VE testified that there is not. AR 66. Mr. Fister's counsel then made clear that this moderate impairment in the ability to perform simple, repetitive, one-to-two-step tasks was found by Dr. Young to apply to Mr. Fister. AR 66; *see* AR 211 (Dr. Young's October 10, 2006 "Medical Source Statement").

Next, Mr. Fister's counsel asked the VE to assume an individual has the same age, education, and work experience as Mr. Fister, and then to assume that the individual also has a moderately severe impairment in the ability to perform activities within a schedule, maintain regular attendance, and punctual and a moderately severe impairment in the ability to complete a normal work day and work week without interruptions from psychologically-based symptoms. AR 66-67. The VE testified that, under those limitations, the individual would not be able to do any of the identified past relevant work or any other work in a competitive environment. AR 67. Mr. Fister's attorney then made clear that these moderately severe limitations were found by Dr. Brandes in 2008 to apply to Mr. Fister. AR 67; *see* AR 245 (Dr. Brandes's April 3, 2008 "Medical Source Statement").

**E. <u>The Administrative Law Judge's Findings</u>**

Applying the sequential evaluative process, on February 9, 2009, the ALJ held that Mr. Fister was not disabled under § 1614(a)(3)(A) of the Social Security Act and therefore was not entitled to supplemental security income. AR 23.

At step one, the ALJ found that Mr. Fister had not engaged in substantial gainful activity since May 20, 2004. AR 17.

At step two, the ALJ found that Mr. Fister suffered from the following severe impairment: affective disorder. AR 17.

At step three, the ALJ found that Mr. Fister did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the listed impairments. AR 18.

The ALJ then determined Mr. Fister's residual functional capacity ("RFC") in order to assess at steps four and five whether he could perform his past relevant work or any other work considering her age, education, and work experience. The ALJ found that Mr. Fister had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), with a mild limitation on concentration, persistence, or pace. AR 18-22.

In making this RFC finding, the ALJ considered the symptoms and how consistent they were with the objective medical evidence (based on the requirements of 20 C.F.R. § 404.1529 and Social Security Rulings 96-4p and 96-7p). AR 18. He also considered opinion evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p. AR 18. Although he did not explicitly state it, the ALJ followed a two-step process, first determining whether there was a medically-determinable physical or mental impairment that reasonably could be expected to produce Mr. Fister's pain and symptoms, and then evaluating the intensity, persistence, and limiting effects of the symptoms to determine the extent that they limited Mr. Fister's ability to do basic work activities. AR 18-21. For the second part, whenever Mr. Fister's statements about the intensity or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ made findings on the credibility of the statements based on "the evidence as a whole." AR 21-22.

As for Mr. Fister's physical symptoms, the ALJ noted that Dr. Athanassious diagnosed Mr.

Fister with job stress, insomnia, headaches, and chest pains, and prescribed Mr. Fister medications for stress, insomnia, and gastrointestinal complaints. AR 18, 21. The ALJ found that Dr. Athanassious's medical records "reflect conservative care for the [Mr. Fister's] physical symptoms that do not prevent medium work functions." AR 18. The ALJ also noted that Dr. Robinson found only minor mechanical low back pain that would not prevent medium work functions and that the Mr. Fister's primary problem was a psychiatric condition. AR 18. The ALJ, therefore, found that Mr. Fister "retains the ability for medium exertion." AR 18.

As for his "emotional" symptoms, the ALJ recounted the reports, diagnoses, and opinions of Drs. Brandes, Perliss, and Young. AR 18-22. The ALJ first compared the Dr. Brandes's February 28, 2005 report and findings with those of Dr. Perliss in his August 16, 2004 report. AR 18-19. The ALJ characterized Dr. Brandes's diagnosis to be that Mr. Fister suffered from an "adjustment disorder with depression and anxiety" "with very slight to slight functional loss except for a slight to moderate limitation on performing complex or varied tasks." AR 18-19. The ALJ then stated that Dr. Brandes "recommended an additional three to six months of treatment and further opined that, with restrictions, [Mr. Fister] could return to work "immediately." AR 19.

Turning to Dr. Perliss's report, the ALJ stated that, "[i]n Dr. Perliss'[s] opinion, [Mr. Fister] had suffered an acute stress syndrome that was substantially resolved with mild depressive residuals," and Mr. Fister's "ability to interact appropriately with others was very slightly impaired due to mild dysphoria and irritability." AR 19. "Dr. Perliss recommended," the ALJ explained, that Mr. Fister "remain off work until about September 2004 to give the claimant time to discuss work matters with his former manager." AR 19. The ALJ also "opined that pace and energy were not seriously limited by the mild vegetative signs." AR 19.

From these reports, the ALJ determined that "Dr. Perliss reached the same diagnosis as Dr. Brandes but believed that [Mr. Fister's] symptoms were in substantial remission with minimal depressive residual symptoms based on results of mental status examination." AR 19. Nevertheless, the ALJ did note that "[w]hile Dr. Brandes believed there were very slight to slight functional limitations for work and slight to moderate functional impairment for performing complex and varied tasks, Dr. Perliss noted none to slight limitations." AR 19. The ALJ then went on to explain:

> Although it appears that [Mr. Fister] initially suffered significant emotional symptoms, he responded to the prescribed medications from his treating physician, Dr. Athanassious, and therapy through Dr. Brandes. This is reflected in the opinions of Dr. Brandes that the claimant could return to work with restrictions and Dr. Perliss that the medical disorder was in substantial remission with slight to no functional loss. I have given [Mr. Fister] the benefit of the doubt and accepted Dr. Brandes'[s] assessment of the degree of limitation on functional capacity except that I do not find substantiating evidence of more than slight difficulty with complex and varied tasks. The adjustment disorder was manifested by depression and anxiety but there is no evidence of persistent cognitive loss to a moderate degree. [Mr. Fister] complained of an inability to focus and diminished concentration and memory, however, he did not consistently pursue medical attention for his emotional symptoms. His reported daily activities also demonstrate the ability for complex and varied tasks. Notably, Dr. Brandes'[s] reports repeatedly emphasize that [Mr. Fister] does not suffer from a major mental illness of the type that would seriously interfere with performing complex and varied tasks. It is also noteworthy that Dr. Brandes and Dr. Perliss expected [Mr. Fister] to return to work well within twelve months of the onset of the adjustment disorder. Thus, Dr. Brandes and Dr. Perliss did not believe that there was a serious loss of ability for performing varied and complex tasks. At worst, [Mr. Fister's] concentration, persistence or pace was mildly impaired due to the adjustment disorder. (To quantify "mildly impaired concentration, persistence or pace," there is about a 90% retained capacity for concentration, persistence or pace when compared to an employee that maintains 100% ability.)

AR 19.

Turning to Dr. Young's evaluation, the ALJ stated that hers was the only evaluation of Mr. Fister during the time that Dr. Brandes was not treating Mr. Fister (September 28, 2006 through February 28, 2008). AR 19-20. The ALJ explained that Mr. Fister "described continued difficulty sleeping, forgetfulness, problems focusing, and diminished concentration," and that Dr. Young diagnosed him with having "primary insomnia; depressive disorder, NOS, with anxious features; rule out somatoform disorder, NOS; and rule out dysthymic disorder." AR 20. The ALJ also noted that "[i]n Dr. Young's opinion, [Mr. Fister's] ability to deal with the public, supervisors, and co-workers was mildly impaired," and that "[o]ne to two steps tasks were considered to be moderately impaired." AR 20. But because, in the ALJ's opinion, Dr. Young relied upon Mr. Fister's subjective complaints, and because the ALJ did not find "the severity of [Mr. Fister's] symptoms to be entirely credible," the ALJ found Dr. Young's finding of "moderate functional loss for straight forward one and two step tasks [to be] inconsistent with the results of her mental status examination that was essentially unremarkable except for a restricted affect." AR 20. Thus, while the ALJ did rely on Dr. Young's opinion to find that "there is some loss of concentration, persistence or pace," he found the loss to be only of "a mild degree and not at the moderate level." AR 20.

The ALJ then turned to Dr. Brandes's 2008 and 2009 opinions and discounted them. AR 19-21. The ALJ acknowledged Dr. Brandes's findings and diagnoses in his April 2008 reports and noted that "Dr. Brandes'[s] latest opinion reflects a significant deterioration in [Mr. Fister's] functional capacity." AR 20. The ALJ then explained that he "considered but d[id] not give great weight to Dr. Brandes'[s] opinion for several reasons": "Dr. Brandes is [Mr. Fister's] treating psychologist but there is a wide span of time when [Mr. Fister] did not pursue therapy. Thus, Dr. Brandes[] did not evaluate or treat Mr. Fister for an extended period of time and could not have accurately evaluated [Mr. Fister's] functional status." AR 20.

The ALJ further explained:

> [Mr. Fister] was placed under a very stressful work situation and decompensated by May 2004. He was on medical leave, however, [and] Dr. Brandes and Dr. Perliss agreed that [he] was only temporarily unable to work and expected him to return to some sort of work in the grocery realm within less than twelve months. The abnormal clinical signs and symptoms noted by Dr. Brandes in his April 2008 report are not so different from the findings that were initially noted. There is no evidence to explain why Dr. Brandes'[s] opinion has significantly changed. Dr. Perliss also reported the symptoms and same diagnosis but believed [Mr. Fister] had recovered sufficiently to return to work. Thus, I do not give controlling weight to Dr. Brandes'[s] opinion.
>
> With respect to functional limitations caused by the emotional disorder, I find that, as reflected below, [Mr. Fister's] daily activities are not restricted. Although [he] described irritability and diminished social interaction, I find that the medical findings associated with his emotional disorder have not been shown to seriously interfere with maintaining social functioning. The ability to maintain concentration, persistence or pace is mildly difficult based on the medical findings as evaluated above and [Mr. Fister's] reported daily activities. I find one to two episodes of decompensation.

AR 21.

The ALJ next addressed Mr. Fister's testimony at the hearing. The ALJ acknowledged that Mr. Fister "experienced significant work[-]related stress" and that "the medical evidence establishes an affective disorder that accounts for [his] subjective complaints." AR 21. The ALJ, however, found that Mr. Fister's account of the severity of his symptoms to be "not entirely credible." AR 21. Although Mr. Fister "complained of back aches and headaches that contribute to his inability to return to work," the ALJ noted that Dr. Athanassious's "conservative and sympomatic care" suggests that Mr. Fister's physical ailments do not preclude work activity. AR 22. The ALJ also noted that "[w]hile [Mr. Fister] complained of spending most of his time at home because of his

emotional disorder, he performs a wide variety of daily activities that reflect a functional capacity for work." AR 22. He also noted that, after February 2005, "there are minimally abnormal medical findings to support [Mr. Fister's] allegation that his emotional disorder remains of significant severity and preclusive of work activity." AR 21. The ALJ also highlighted the "extended period when [Mr. Fister] did not pursue medical attention," which the ALJ stated was "consistent with the expected improvement noted by Dr. Brandes and Dr. Perliss" in 2004. AR 21. Indeed, the only evaluation during this period was by Dr. Young, and her report, according to the ALJ, "showed no significantly abnormal medical findings consistent with [Mr. Fister's] subjective complaints." AR 21-22. The ALJ thus found "that the medical findings and treatment do not substantiate the level of symptoms alleged by [Mr. Fister]." AR 22.

Lastly, the ALJ addressed the Ms. Fister's report. AR 22. After noting her observations in her son's behavior, the ALJ stated that "[a]lthough [Mr. Fister's] reported daily activities have changed since he stopped working, his ability to pursue activities discredit the level of his symptoms and allegation that he is unable to work." AR 22. His activities, the ALJ stated, "show a physical and mental capacity that is inconsistent with [Mr. Fister's] allegation of significant functional loss." AR 22. Accordingly, "[w]hen considering the evidence as a whole," the ALJ found "that the alleged intensity, persistence and functionally limiting effects of the subjective complaints are not credible." AR 22.

Having determined Mr. Fister's RFC as allowing for "medium" work, with a mild limitation on concentration, persistence, or pace, the ALJ proceeded with steps four and five of the sequential evaluative process.

At step four, the ALJ found that Mr. Fister was capable of performing his past relevant work. The ALJ summarized the VE's testimony regarding Mr. Fister's relevant work experience and stated that "[i]t was the opinion of the vocational expert that the demands of the job of grocery clerk did not exceed the medium level of exertion." AR 23. The ALJ also stated that "[t]he vocational expert further testified that the mild loss of concentration, persistence or pace would not preclude the job of grocery clerk." AR 23. Thus, "[b]ased on the credible testimony of the vocational expert," the ALJ found "that [Mr. Fister] retains the residual functional capacity to perform his past relevant work as

a grocery clerk." AR 23.

At step five, the ALJ noted that Mr. Fister was a "younger individual" pursuant to 20 C.F.R. § 404.1563 and that, "[i]n view of his age," Mr. Fister was "not expected to encounter difficulty adjusting to other work" and, thus, there was "no issue of transferable skills" under that same regulatory provision. AR 23. The ALJ then stated that "[t]he vocational expert was asked to consider a hypothetical individual with the same vocational profile and residual functional capacity as [Mr. Fister] and identify any jobs such hypothetical individual could be expected to perform," and "[i]n response, the vocational expert testified to the job of housekeeper that was light in exertion and unskilled with 2,800 jobs in the local economy and 200,000 in the national economy." AR 23. Thus, "[b]ased on the credible testimony of the vocational expert," the ALJ found that "there are other jobs existing in significant numbers in the national economy that Mr. Fister can perform." AR 23.

The ALJ thus concluded that the Mr. Fister was "not disabled as defined in the [Social Security] Act at any time through the date of this decision." AR 23.

## V. DISCUSSION

Mr. Fister challenges the ALJ's decision on several grounds. He argues that: (1) his RFC is far more restricted than the ALJ found, and the ALJ's finding was not supported by substantial evidence or based on correct legal grounds; (2) at step four, that the ALJ improperly found that he could work as a "grocery clerk"; and (3) contrary to the ALJ's finding at step five, he cannot perform the job of a "housekeeper," as cited by the VE, because the DOT classifies that job as a "heavy" occupation.

### A. Mr. Fister's RFC

Mr. Fister challenges the ALJ's finding that he has an RFC for medium work, with only a mild limitation on concentration, persistence, or pace. Plaintiff's Motion, ECF No. 19 at 18-28. He argues that in so finding the ALJ improperly discounted the opinions of Dr. Brandes and Dr. Young, the testimony of Mr. Fister, and the lay witness testimony provided by Ms. Fister.

#### 1. The Testimony of Dr. Brandes

As the record reflects, Dr. Brandes became Mr. Fister's treating psychologist on June 17, 2004. Dr. Brandes treated Mr. Fister from June 17, 2004 through September 27, 2006 and began treating

Mr. Fister again on February 28, 2008. AR 249. There was a "gap" in Dr. Brandes treatment from September 28, 2006 through February 27, 2008. AR 249. During those treating periods, Dr. Brandes issued written reports about Mr. Fister's condition on February 28, 2005, July 13, 2005, April 8, 2008, and April 23, 2009, and he issued a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment regarding Mr. Fister on April 3, 2008. AR 182-208, 244-51.

As the court can tell, Mr. Fister makes two distinct arguments regarding the ALJ's treatment of Dr. Brandes testimony. First, Mr. Fister argues that the ALJ simply "rejected" Dr. Brandes's opinion. Plaintiff's Motion, ECF No. 19 at 20. This is not accurate. Rather, the ALJ "considered but [did] not give great weight to Dr. Brandes'[s] opinion" and "[did] not give controlling weight to Dr. Brandes'[s] opinion." AR 20, 21. The ALJ did not reject Dr. Brandes's opinion outright.

Second, and primarily, Mr. Fister argues that, instead of giving Dr. Brandes's opinion controlling weight, the ALJ improperly gave greater weight to the opinion of Dr. Perliss—an examining but not a treating physician—than he did to the opinion of Dr. Brandes's—Mr. Fister's treating physician. Plaintiff's Motion, ECF No. 19 at 20-23. The court agrees with Mr. Fister.

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id*. (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

"If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

UNITED STATES DISTRICT COURT
For the Northern District of California

case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id*. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id*. (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 630 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "'To reject [the] <u>uncontradicted</u> opinion of a treating or examining doctor, an ALJ must state <u>clear and convincing reasons</u> that are supported by substantial evidence.'" *Id*. (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)) (emphasis added). "'If a treating or examining

doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Id*. (quoting *Bayliss*, 427 F.3d at 1216) (emphasis added).[2] Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

In his decision, the ALJ stated that Dr. Brandes's opinion in his February 28, 2005 report, on the whole, was similar to Dr. Perliss's opinion in his August 16, 2004 report and that both doctors believed that Mr. Fister would be able to return to work soon. AR 18-19. Although this is not exactly true (Dr. Brandes and Dr. Perliss clearly disagreed on to the extent of Mr. Fister's

---

[2] Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different. As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion. While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors—neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d). Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion. Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester*, 81 F.3d at 831 n.8.

impairment[3]), the ALJ nevertheless accepted Dr. Brandes's 2005 opinion about Mr. Fister's degree of limitation (with the exception of Dr. Brandes's opinion that Mr. Fister had "slight-moderate" impairment in his ability "to perform complex or varied tasks," which the ALJ rejected because there was no evidence of persistent cognitive loss to a moderate degree, Mr. Fister's daily activities demonstrated the ability to complex and varied tasks, and Dr. Brandes emphasized that Mr. Fister did not suffer from major mental illness) when finding that Mr. Fister had an RFC to perform medium work, with a mild limitation on concentration, persistence, or pace. AR 19. This was not erroneous.

What was erroneous was that the ALJ did not give proper weight to Dr. Brandes's opinions from 2008 and 2009, which, on the whole, expressed that Mr. Fister's disability had gotten worse and precluded him from working even unskilled labor positions on a full-time basis. *See* AR 250. Dr. Brandes noted that Mr. Fister had a "substantial loss" in his "ability to respond appropriately to supervision, co-workers and usual work situations" and his "ability to deal with changes in a routine work setting," AR 247, and that his level of impairment with respect to numerous work functions also was worse than it was in 2005, *see* AR 245-46. Indeed, in his April 3, 2008 Medical Source Statement Concerning The Nature and Severity of an Individual's Mental Impairment, Dr. Brandes concluded that Mr. Fister had "moderately severe" limitations with respect to his "ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances," and his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," AR 245, "moderate" limitations with respect to his abilities "to

---

[3] Dr. Perliss found only "very slight impairment" in Mr. Fister's ability "to relate effectively and appropriately with others," while Dr. Brandes found a "slight-moderate" impairment in Mr. Fister's ability "to perform complex or varied tasks"; a "slight" impairment in his abilities "to maintain a work pace appropriate to a given workload," "to relate to other people beyond giving and receiving instructions," "to influence other people," "to make generalizations, evaluations, or decisions without immediate supervision," and "to accept and carry out responsibility for direction, control, and planning"; and a "very slight" level of impairment in his abilities "to comprehend and follow instructions" and "to perform simple and repetitive tasks." *Compare* AR 205 *with* AR 286-87.

understand and remember detailed instructions," "to carry out detailed instructions," "to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure),"to work in coordination with or proximity to others without being unduly distracted by them," "to accept instructions and to respond appropriately to criticism from supervisors," and "to respond appropriately to changes in the work setting," AR 245-46, and "mild" limitations with respect to a number of other functions, AR 245-46. These conclusions, provided by Mr. Fister's treating physician, are evidence that Mr. Fister's disability had worsened since 2005. Dr. Brandes thus recommended that Mr. Fister be considered disabled from full time employment. AR 251.

Nevertheless, the ALJ "did not give great weight," let alone "controlling weight," to Dr. Brandes's opinions from 2008 and 2009. AR 20, 21. The ALJ gave two reasons for not doing so. First, the ALJ emphasized that, although Dr. Brandes was Mr. Fister's treating psychologist, there was a gap in Dr. Brandes's treatment of him and so Dr. Brandes "did not evaluate or treat [Mr. Fister] for an extended period of time and could not have accurately evaluated [Mr. Fister's] functional status." AR 20. This statement simply is not accurate. Dr. Brandes treated Mr. Fister from 2004 to 2006, and when Dr. Brandes provided his report on April 8, 2008, he had been treating Mr. Fister again since February 28, 2008. This is particularly important because the ALJ relied so heavily on Dr. Perliss's August 16, 2004 report, which was based on only a single examination of Mr. Fister, and Dr. Brandes's February 28, 2005 report, which was based on a shorter period of treatment than his subsequent reports. *See Lester*, 81 F.3d at 833 ("[W]e note that Dr. Kho's 1987 statements were made before Lester underwent a comprehensive psychological assessment—and, therefore, before Dr. Kho was aware of the full extent of Lester's psychiatric impairment. Because his later opinion was based on a more complete evaluation of the combined impact of all of Lester's impairments, that opinion should be accorded greater weight.") (citing *Sprague*, 812 F.2d at 1231). The ALJ's reason for discrediting Dr. Brandes's 2008 and 2009 opinions—that there was a gap in treatment in 2006—simply is not compelling, especially where Dr. Brandes had significantly more exposure to and experience with Mr. Fister than any other physician, and where these opinions are not contradicted by any other opinions from those years. *See id.*

Second, the ALJ stated that Dr. Brandes's 2008 findings about Mr. Fister's level of disability were "not so different from" his findings from 2004 and that there was "no evidence to explain why Dr. Brandes'[s] opinion" had changed so significantly. AR 21. This, too, is an inaccurate statement. As described above, Dr. Brandes's findings about Mr. Fister's level of disability were dramatically different than this earlier ones. *Compare* AR 193-206 *with* AR 245-51. And Dr. Brandes explicitly made this point in his April 23, 2009 letter, when he describes (after seeing Mr. Fister again several times over the past year) Mr. Fister's worsening condition. *See* AR 182 ("Dr. Perliss and I initially saw Thomas Fister being able to perform with some accommodation in the workplace and his mental and emotional problems would not[,] we thought[,] seriously interfere with his ability to function. However, over the years [Mr.] Fister has proved that his condition must be considered more chronic."). Moreover, contrary to the ALJ's statement, there was evidence to support Dr. Brandes's new opinion. As Mr. Fister's treating physician, Dr. Brandes saw Mr. Fister several times during 2008 and 2009, *see* AR 182, and evaluated him during that time, *see* AR 244-51.

In sum, the ALJ improperly discredited the later, more comprehensive opinion of Mr. Fister's treating physician (Dr. Brandes), which was based on multiple treatment sessions and supported by evidence (and which was not contradicted by other contemporary opinions), and, instead, improperly relied more heavily on the much older opinion of a non-treating physician who only examined Mr. Fister once (Dr. Perliss). And as explained above, the ALJ's stated reasons for doing so do not constitute legitimate reasons, let alone clear and convincing ones, that are supported by substantial evidence, as required by Ninth Circuit case law. Even if Dr. Brandes's opinion is not entitled to controlling weight, it is still entitled to deference, and the ALJ did not give it that. *See Orn*, 495 F.3d at 632; *see also* SR 96-02p at 4 (Cum. Ed. 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").[4]

---

[4] In his opposition and cross-motion, when arguing that it was proper for the ALJ to have relied more on Dr. Perliss's opinion than on Dr. Brandes's opinion, the Commissioner suggests that the line between a treating physician and an examining physician is not as bright as one might think. *See* Opposition and Cross-Motion, ECF No. 20 at 11 (quoting *Ratto v. Sec'y Dep't of Health &*

UNITED STATES DISTRICT COURT
For the Northern District of California

**2. The Testimony of Dr. Young**

Mr. Fister also argues that the ALJ improperly discredited Dr. Young's opinion. Plaintiff's Motion, ECF No. 19 at 23-24. Dr. Young did not treat Mr. Fister, but she examined him on October 10, 2006. AR 209-211.

As he did with respect to Dr. Brandes's 2008 opinion, the ALJ inaccurately summarized Dr. Young's opinion. As explained above, the ALJ noted that Dr. Young relied upon Mr. Fister's subjective complaints, and because the ALJ did not find "the severity of [Mr. Fister's] symptoms to be entirely credible," the ALJ found Dr. Young's finding of "moderate functional loss for straight forward one and two step tasks [to be] inconsistent with the results of her mental status examination that was essentially unremarkable except for a restricted affect." AR 20. "An ALJ may reject a . . . physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Morgan*, 169 F.3d at 602). But here, Dr. Young did not do that. As her report makes clear, her opinion was "[b]ased on today's evaluation, including clinical interview, mental status

---

*Human Servs.*, 839 F. Supp. 1415, 1425 (D. Or. 1993). Indeed, as one court has explained:

> It is not necessary, or even practical, to draw a bright line distinguishing a treating physician from a non-treating physician. Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact. For instance, the opinion of a doctor who has examined the patient will ordinarily be entitled to greater weight than the opinion of a non-examining physician whose only knowledge of the patient is obtained from written reports. 20 C.F.R. § 404.1527(d)(1). Similarly, the opinion of a physician who has treated the patient for an extended period of time is usually entitled to greater weight than a physician who has only examined the patient for SSA purposes, because the treating physician is employed to cure, and also has a greater opportunity to know and observe the patient over the course of time. *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). *See also* 20 C.F.R. § 404.1527(d)(2).

*Ratto*, 839 F. Supp. at 1425; *see Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir. 2003) (describing this statement as "most helpful"). This quote, though, supports giving more weight to Dr. Brandes's opinion than to Dr. Perliss's opinion. Dr. Brandes, after all, accounts for numerous points on the "continuum" of Mr. Fister's care, but Dr. Perliss accounts for only one.

examination, and review of the available documentation," AR 211, and the findings in her report bear this out, *see* AR 209-211. Indeed, the ALJ's rejection of her opinion is similar to that of the ALJ in *Ryan*, where the Ninth Circuit, in concluding that the ALJ erred, explained:

> [A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations. *Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001) ("In sum, the ALJ appears to have relied on her doubt's about [the claimant's] overall credibility to reject the entirety of [the examining psychologist's] report, including portions that [the psychologist] deemed to be reliable."). There is nothing in the record to suggest that Dr. Randhawa disbelieved Ryan's description of her symptoms, or that Dr. Randhawa relied on those descriptions more heavily than his own clinical observations in reaching the conclusion that Ryan was incapable of maintaining a regular work schedule. *Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999) (substantial evidence did not support ALJ's finding that examining psychologists took claimant's "statements at face value" where psychologists' reports did not contain "any indication that [the claimant] was malingering or deceptive").

*Ryan*, 528 F.3d at 1199-1200. Likewise, the ALJ here provided neither clear and convincing nor reasons nor legitimate ones for discrediting Dr. Young's opinion. This was error.

**3. Testimony of Mr. Fister**

Mr. Fister also argues that the ALJ improperly discounted his own testimony. Plaintiff's Motion, ECF No. 19 at 25-28. To determine whether a claimant's testimony about subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis. *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms. *See Lingenfelter*, 504 F.3d at 1036. Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear, and convincing reasons for doing so. *Id.* When the ALJ finds a claimant's testimony not reliable, the ALJ must "specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan*, 169 F.3d at 499. This court defers to the ALJ's credibility determination if it is supported by substantial evidence in the record. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

Here, the ALJ determined that Mr. Fister met the first step in the inquiry. AR 21 ("The medical

UNITED STATES DISTRICT COURT
For the Northern District of California

evidence establishes an affective disorder that accounts for the subjective complaints."). The ALJ did not find Mr. Fister to be malingering. *See* AR 21-22. So, the ALJ must have provided specific, clear, and convincing reasons for discounting Mr. Fister's testimony about the severity of his symptoms. He did not.

First, the ALJ discounted Mr. Fister's testimony because the ALJ believed that the medical evidence supported only a minimal level of impairment. But, as explained above, the ALJ improperly discounted Dr. Brandes's 2008 and 2009 opinions and Dr. Young's 2006 opinion when discussing the medical evidence. Had the ALJ properly considered those opinions, the medical evidence would have supported a higher level of impairment and, thus, Mr. Fister's testimony concerning the severity of his symptoms.

Second, the ALJ discounted Mr. Fister's testimony because Mr. Fister performed "a wide variety of daily activities," such as doing household chores and yard work, going shopping, cooking, and maintaining a home. AR 22. The ALJ stated that these activities "reflect a functional capacity for work." AR 22. The Ninth Circuit "'has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability.'" *Orn*, 495 F.3d at 639 (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)). Indeed, as the Ninth Circuit panel in *Orn* explained:

> In *Fair*, we wrote that daily activities may be grounds for an adverse credibility finding "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." 885 F.2d at 603 (emphasis omitted); *see also Burch*, 400 F.3d at 681 (stating that adverse credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace"). Here, there is neither evidence to support that Orn's activities were "transferable" to a work setting nor proof that Orn spent a "substantial" part of his day engaged in transferable skills. *See Fair*, 885 F.2d at 603. The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Burch*, 400 F.3d at 681.

*Id*.

Here, the ALJ did not make specific findings about whether Mr. Fister spent a "substantial" part of his day engaging in the cited activities or whether the activities are "transferrable" to the workplace. *See* AR 22. Instead, the ALJ merely concluded that the activities "reflect a functional

UNITED STATES DISTRICT COURT
For the Northern District of California

capacity for work." This does not suffice.

Accordingly, the court finds the ALJ improperly discounted Mr. Fister's testimony about the severity of his symptoms.

**4. Ms. Fister's Testimony**

Mr. Fister also argues that the ALJ improperly discredited his mother's testimony. Plaintiff's Motion, ECF No. 19 at 25. "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2005) (citing 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). "Indeed, 'lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment.'" *Id*. (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)) (citations omitted). "Consequently, '[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness.'" *Id*. (quoting *Dodrill*, 12 F.3d at 919); *see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.").

Here, the ALJ did consider Ms. Fister's testimony. AR 22. That said, the ALJ appears to have discounted Ms. Fister's testimony for the same reason that he discounted Mr. Fister's testimony: the ALJ believed that Ms. Fister's testimony showed that Mr. Fister engaged in activities that are inconsistent with significant functional loss and reflected a functional capacity for work. *See* AR 22.[5] But, as with Mr. Fister's testimony, had the ALJ properly considered Dr. Brandes's 2008 and 2009 opinions and Dr. Young's 2006 opinion, the medical evidence would have supported a higher level of impairment and, thus, Ms. Fister's testimony concerning the severity of Mr. Fister's symptoms. The ALJ's discount of her testimony for the stated reason, then, was error.

---

[5] The court acknowledges that the ALJ's reason for rejecting Ms. Fister's testimony is not particularly explicit. *See* AR 22. Still, the court believes that, when reading the paragraphs addressing Mr. Fister's and Ms. Fister's testimony in the ALJ's decision, the ALJ did not "silently disregard" her testimony, as Mr. Fister suggests. *See* Plaintiff's Motion, ECF No. 19 at 25.

UNITED STATES DISTRICT COURT
For the Northern District of California

**B. Step Four: Mr. Fister's Relevant Prior Work**

Mr. Fister argues that certain portions of the VE's testimony was internally inconsistent and,by relying on it, the ALJ improperly found that Mr. Fister could perform his past relevant work. Plaintiff's Motion, ECF No. 19 at 15-17.

For this section, it is worth recalling that Mr. Fister worked as a "journeyman" (1983 to 1986), then as a "department head" (1986 to 1996), then as a "head clerk" (1996 to 1999), then as an "assistant store manager" (1999 to 2001), and finally as a "grocery manager" (2001 to 2004). AR 34, 134. Mr. Fister testified that "[when] you go from "journeyman" clerk to a "department head," you're more of a full-time employee," although it is "[b]asically the same type of work, stocking and overseeing the store for a shift." AR 35. He testified that a "head clerk" was a "similar position" to a "department head": "[T]he hours change a little bit, but [the jobs are] basically the same, almost the same position, different title." AR 35. Mr. Fister's job as a "journeyman clerk" does not qualify as past relevant work because he had not been in that position for more than 15 years before he became disabled. *See* 20 C.F.R. § 404.1565(a). It also is important to recall that the VE testified that the DOT title for Mr. Fister's job as a "department head" is "department manager" (#299.137-010) and that the DOT title for Mr. Fister's job as a "head clerk" is "grocery clerk" (#290.477-0184). AR 58.

With this testimony in mind, it is clear that Mr. Fister is correct that the VE's testimony was internally inconsistent. When presented with the second hypothetical situation (an individual with the same age, education, background, and experience as Mr. Fister, who can perform work with a medium exertional strength, and who has mild non-exertional limitations in the areas of concentration, pace, and persistence (roughly a 10% reduction in ability) and asked whether the individual would be able to perform the identified past relevant work, the VE testified that those mild limitations "would erode [the individual's] ability to perform the higher functional levels of manager, managerial jobs, department head, those types of things." AR 61 (emphasis added). However, the VE testified that the individual "would still be able to perform the grocery clerk position." AR 61 (emphasis added). Thus, under those conditions, because the VE ruled out that possibility that the individual could perform the job of "department head" (or "department manager"

pursuant to the DOT), the individual also could not perform the similar (and higher) position of "head clerk" (or "grocery clerk" pursuant to the DOT). In other words, the VE's testimony that the individual could perform the "grocery clerk" job is inconsistent with his testimony that the individual could not perform the "department head" job.

Presumably, the ALJ did not realize this inconsistency when he found that Mr. Fister was capable of performing his past relevant work. In his decision, the ALJ summarized the VE's testimony regarding Mr. Fister's relevant work experience and stated that "[i]t was the opinion of the vocational expert that the demands of the job of grocery clerk did not exceed the medium level of exertion." AR 23. The ALJ also stated that "[t]he vocational expert further testified that the mild loss of concentration, persistence or pace would not preclude the job of grocery clerk." AR 23. Thus, "[b]ased on the credible testimony of the vocational expert," the ALJ found "that [Mr. Fister] retains the residual functional capacity to perform his past relevant work as a grocery clerk." AR 23. Because the VE's testimony was internally inconsistent, the ALJ's reasoning was flawed. Pursuant to the VE's testimony, Mr. Fister is not able to perform his "department head" job or any of the jobs higher than that. Thus, Mr. Fister is not able to perform any of his past relevant work. The ALJ erred in ruling that he could.

**C. <u>Step Five: Housekeeper</u>**

Finally, Mr. Fister argues that the ALJ erred in finding that he could perform the job of a housekeeper. Plaintiff's Motion, ECF No. 19 at 17-18.

At step five, if (considering residual functional capacity, age, education, and work experience) the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. 20 C.F.R. § 404.1520(a)(4)(v). The Commission may sustain its burden at step five by posing hypothetical questions to a vocational expert that are based on a claimant's residual functional capacity. The vocational expert may give evidence about jobs that a hypothetical employee with the same residual functional capacity as the claimant would be able to perform. *See* 20 C.F.R. § 404.1520(g). A vocational expert's recognized expertise provides the necessary foundation for his or her testimony, and no additional foundation is required. *See Bayliss*, 427 F.3d at 1217-18. The hypothetical questions must be based on a residual

functional capacity for which there exists substantial support in the record. *See Magallanes*, 881 F.2d at 756-57.

In the fourth hypothetical situation presented to the VE, the ALJ asked, assuming an individual had the same age, education, background, and experience as Mr. Fister, who can perform work with a medium exertional strength, and who also had a moderate non-exertional limitation in the areas of concentration, pace, and persistence, whether there are other jobs in the economy that the individual could perform. AR 62. The VE testified that the individual would be able to perform the job of a "Housekeeper" as identified by the DOT (# 381.687-014). AR 62. The VE stated that there are both medium exertional strength and light exertional strength housekeeping positions available in the local and national economies. AR 62. Based on this testimony, the ALJ found at step five that Mr. Fister could perform the job of a housekeeper. AR 23.

Mr. Fister now points out, though, that the DOT position of housekeeper cited by the VE (# 381.687-014) actually requires heavy exertional strength.[6] As the cited entry in the Dictionary of Occupational Titles states, in relevant part:

> 381.687-014 CLEANER, COMMERCIAL OR INSTITUTIONAL
>
> Industry Designation: Any Industry
>
> Alternate Titles: Clean-Up Worker; Housekeeper; Janitor; Laborer, Building Maintenance; Mopper; Porter; Scrubber; Sweeper
>
> Keeps premises of office building, apartment house, or other commercial or institutional building in clean and orderly condition: Cleans and polishes lighting fixtures, marble surfaces, and trim, and performs duties described in CLEANER (any industry) I Master Title. May cut and trim grass, and shovel snow, using power equipment or handtools. May deliver messages. May transport small equipment or tools between departments. May setup tables and chairs in auditorium or hall. May be designated according to duties performed as Hall Cleaner (hotel & rest.); Light-Fixture Cleaner (any industry); Marble Cleaner (any industry); Metal Polisher (any industry); Paint Cleaner (any industry); or according to equipment used as Scrubbing-Machine Operator (any industry).
>
> GUIDE FOR OCCUPATIONAL EXPLORATION: 05.12.18

---

[6] The Commissioner suggests that the VE "simply misstated the code for the job he was describing" and states that the DOT "does have a light job titled housekeeper." Opposition and Cross-Motion, ECF No. 20 at 14 (citing DICOT 323.687-014, 1991 WL 672783 (G.P.O.)). The court, however, is confined to the record before it, and it will not speculate as to what the VE "meant" when he testified before the ALJ.

UNITED STATES DISTRICT COURT
For the Northern District of California

> STRENGTH: <u>Heavy Work</u> - Exerting 50 to 100 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or 10 to 20 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. <u>Physical demand requirements are in excess of those for Medium Work.</u>
>
> Reasoning: Level 1 - Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> . . .

DICOT 381.687-014, 1991 WL 673257 (G.P.O.) (emphasis added). Thus, under the ALJ's finding that Mr. Fister could perform work requiring medium exertional strength, Mr. Fister could not perform the housekeeping job that the VE cited. Moreover, the VE did not provide testimony to support a deviation from the DOT, the ALJ did not ask the VE whether his testimony deviated from the DOT, and the ALJ did not mention, let alone cite evidence to justify, the deviation in his decision. *See* AR 23, 62-63. This was error. *See Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007) (an ALJ may not rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the Dictionary of Occupational Titles).

**D. <u>Remand for the Payment of Benefits Is Appropriate</u>**

Given the court's conclusions that the ALJ improperly discredited Dr. Brandes's 2008 and 2009 opinions, Dr. Young's 2006 opinion, Mr. Fister's testimony, and Ms. Fister's testimony, and that the ALJ erred by finding that Mr. Fister could perform his past relevant work and also could perform the job of "housekeeper" pursuant to the DOT, the court must decide whether to remand this case back to the Social Security Administration for further proceedings or for the payment of benefits.

The Ninth Circuit has provided guidance on this question:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. *See Harman*, 211 F.3d at 1178. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996); *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988). More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the

UNITED STATES DISTRICT COURT
For the Northern District of California

> claimant disabled were such evidence credited. *Harman*, 211 F.3d at 1178; *see also McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002); *Smolen*, 80 F.3d at 1292.
>
> Where the *Harman* test is met, we will not remand solely to allow the ALJ to make specific findings regarding excessive pain testimony. Rather, we take the relevant testimony to be established as true and remand for an award of benefits. *Varney*, 859 F.2d at 1401; *see also Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998) (quoting *Varney* ); *Lester*, 81 F.3d at 834 (same); *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989) (same); *but cf. Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (holding that the court has flexibility in crediting petitioner's testimony if substantial questions remain as to her credibility and other issues must be resolved before a determination of disability can be made).

*Benecke v. Barnhart*, 379 F.3d 587, 594-95 (9th Cir. 2004).

Because the court concludes that the ALJ did not provide legally sufficient reasons for discrediting Dr. Brandes's 2008 and 2009 opinions, Dr. Young's 2006 opinion, Mr. Fister's testimony, and Ms. Fister's testimony were improperly discredited, their testimony is treated as true. *Benecke*, 379 F.3d at 594 (citing *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000); *Smolen v. Chater*, 80 F.3d 1273, 1281-83 (9th Cir. 1996); and *Varney v. Sec. of Health and Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988)). And because Dr. Brandes's 2008 and 2009 opinions and Dr. Young's 2006 opinion are treated as true, and because there is no other testimony from 2008 or 2009 that contradicts Dr. Brandes's opinions, there is no need to remand for further proceedings.

As the court described above, at the administrative hearing, Mr. Fister's counsel asked the VE, if an individual has a moderate impairment in the ability to perform simple, repetitive, one-to-two-step tasks (as Dr. Young found Mr. Fister had), whether there is any other work in the open economy that the individual could do. AR 65-66, *see* AR 211 (Dr. Young's October 10, 2006 "Medical Source Statement"). The VE testified that there is not. AR 66. Mr. Fister's counsel then asked the VE to assume that an individual has the same age, education, and work experience as Mr. Fister, and then to assume that the individual also has a moderately severe impairment in the ability to perform activities within a schedule, maintain regular attendance, and punctual and a moderately severe impairment in the ability to complete a normal work day and work week without interruptions from psychologically-based symptoms (as Dr. Brandes found Mr. Fister had in 2008). AR 66-67; *see* AR 245 (Dr. Brandes's April 3, 2008 "Medical Source Statement"). The VE testified that, under those limitations, the individual would not be able to any of the identified past relevant work or any other

work in a competitive environment. AR 67. Thus, using Mr. Fister's now-credited limitations, the VE already testified that he cannot perform his past relevant work or any other jobs in the national economy. The court finds that remand for the payment of disability benefits is appropriate.[7]

## VI. CONCLUSION

Based on the foregoing, the court **GRANTS** Mr. Fister's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgement, and **REMANDS** this case to the Social Security Administration for the payment of benefits.

**IT IS SO ORDERED.**

Dated: September 30, 2012

LAUREL BEELER
United States Magistrate Judge

[7] Unlike the situation in *Connett*, which is cited by the Commissioner, there are not any substantial questions about Mr. Fister's credibility and other issues that must be resolved. *See* 340 F.3d at 876.

UNITED STATES DISTRICT COURT
For the Northern District of California